## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **JOHN WADE ADAMS,** | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **No. 3:02-CV-2042-H (BH)** |
| | ) | **ECF** |
| **NATHANIEL QUARTERMAN,[1] Director,** | ) | **Referred to U.S. Magistrate Judge** |
| **Texas Department of Criminal Justice,** | ) | |
| **Correctional Institutions Division,** | ) | |
| **Respondent.** | ) | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to the provisions of 28 U.S.C. § 636(b) and an Order of the United States District Court for the Northern District of Texas, this case has been referred to the United States Magistrate Judge. The findings, conclusions, and recommendation of the Magistrate Judge are as follows:

## I. NATURE OF THE CASE

A state prison inmate has filed a petition for writ of habeas corpus pursuant to Title 28, United States Code, Section 2254.

## II. PARTIES

Petitioner, John Wade Adams, is an inmate in the custody of the Texas Department of Criminal Justice, Correctional Institutions Division (TDCJ-CID). Respondent is Nathaniel Quarterman, Director of TDCJ-CID.

---

[1] On June 1, 2006, Nathaniel Quarterman became the Director of the Texas Department of Criminal Justice - Correctional Institutions Division. The Court thus substitutes him for Douglas Dretke. *See* Fed. R. Civ. P. 25(d)(1).

## III.  BACKGROUND

**A.**    *Factual Background*

Petitioner was convicted of the capital murder of Donna Duncan Vick during a robbery of her home. *Adams v. State*, No. 71,307, slip. op. at 2 (Tex. Crim. App. Jun. 22, 1994) (unpublished). The evidence adduced at trial showed that Vick, a 52-year-old widow and minister to homeless people, invited Gregory Wright and Petitioner into her home, where she fed them.  After she went to sleep, she was repeatedly stabbed in her bed with Petitioner's pocket knife and a butcher knife from her kitchen.  Petitioner and Wright then gathered electronic equipment, tools and a rifle, placed them in her white Chrysler New Yorker, and left.  That evening, when Petitioner and Wright were selling the items for drugs, Petitioner commented, "Man, I just killed for this [stuff]."  (32 Rep.'s R. (RR) at 107 (expletive redacted).)  Petitioner later also commented "I have already done killed one [woman] and I'll kill another one."  (*Id.* at 192 (expletive redacted).)

**B.**    *State Proceedings*

During jury selection and the guilt/innocence phase of the trial, the only mitigating factors presented to the jury were that Petitioner was not the primary actor in the murder and that he reported the crime and cooperated with the police in their investigation.  (*See* 8 RR 71-72; 11 RR 54-55; 12 RR 63-64; 16 RR 63-64; 22 RR 70-71; 25 RR 122-24; 28 RR 127-28 (voir dire); 34 RR 143-76; 35 RR 20-21, 27-28, 31-33, 37-39, 44-47; Hearing at 77-81 (trial).)  Petitioner did  testify regarding his brief work history.

During the penalty phase of trial, the only evidence presented was from the prosecution.  The prosecution's evidence included Petitioner's prior convictions for robbery, for possessing a controlled substance, and for burglary of a habitation as well as the circumstances of these crimes.  The

jury also heard evidence regarding the trouble that Petitioner had had in prison, including fights, arguments, threatening language, and tattoos signifying membership in a prison gang. (35 RR at 75-112; 36 RR at 8-22). Trial counsel called no witnesses for the defense at the punishment phase, and he presented no facts about Petitioner's background, childhood, or family to the jury. Brief reference was made to Petitioner's lesser role in the murder and his cooperation with police during argument to the jury.[2] (36 RR 36).

A jury convicted Petitioner of capital murder, and his punishment was assessed at death by lethal injection. *State v. Adams*, No. F97-01214-PJ (Crim. Dist. Ct. No. 3, Dallas County, Tex. July 28, 1998). He appealed to the Texas Court of Criminal Appeals, which affirmed the conviction and death sentence. *Adams v. State*, No. 73,132 (Tex. Crim. App. 2000) (unpublished). Petitioner filed a petition for writ of certiorari to the Supreme Court, which was denied on October 1, 2001. *Adams v. Texas*, 534 U.S. 830 (2001). During the pendency of his direct appeal, Petitioner filed a state application for writ of habeas corpus, and the trial court entered findings of fact and conclusions of

---

[2] Trial counsel's entire argument during punishment was as follows:

This was a horrible offense, but it was a one-time situation as far as that type of activity, so we're asking you to consider that there is (sic) at least some mitigating factors here: The fact that Gregory Wright was brought to justice only because of the actions of this defendant. Only.

Gregory Wright, this defendant's statements led to his arrest, led to discovery of evidence that was later used against Gregory Wright, and the evidence that these prosecutors brought back in December to present their case against Gregory Wright. So the evidence you have found supports this defendant being an accomplice.

But an accomplice does not make in an instigator, does not make him a leader, and as far as a prior criminal record regarding acts of violence, it's nonexistent other than that one act 15 years ago. So we're asking you to answer that question that there is (sic), in fact, some mitigating factors in this case. Maybe not a lot, but a sufficient amount to keep this defendant locked up until he's 75 years old, and that's what you would be saying if you, in fact, answer that question yes.

(36 RR 36-37.)

3

law and recommended that relief be denied.  *Ex parte Adams*, No. W97-01214-J(A) (Crim. Dist. Ct.

No. 3, Dallas County, Tex., Mar. 6, 2002); State Habeas Record (SHR) at 501-98.)

### 1.   **Petitioner's Habeas Evidence**

In support of his state application, Petitioner presented his own affidavit as well as the

affidavits of three siblings; his former foster mother concerning his early childhood; a mitigation

specialist; and Dr. Paula Lundberg-Love, Ph.D.  According to this evidence, he was conceived

during his mother's known marital infidelity but was given the name of his presumptive father

(Adams) instead of his biological father (St. John).  (SHR at 97, 112, 119.)  His mother had multiple

husbands and boyfriends, with whom her relationships were volatile, and their home life was

characterized by alcohol and physical violence, where he and his siblings lived in poverty, were

frequently uprooted and were sometimes abandoned for days at a time without food or basic care.

During one of these times, the children were found in a mobile home, as described in the affidavit

of Linda Elliott, which states in relevant part:

> I was working in the office when a little girl came to the door and said she was
> hungry.  When I investigated, I found three small children alone in the mobile home.
> They had not eaten in three or four days.  They did not know where their parents
> were.  One of these children was John Wade Adams.  John was about two years old.
> He was wearing nothing but a pair of overalls that were pinned together with straight
> pins.  He was covered from head to foot with sores, and I suspected some of them
> could have been caused by cigarette burns.  John was almost a wild child.  His pri-
> vate parts were raw.  I decided to take John in right then and there.  I took him home
> and immediately fed and bathed him.
>                                    . . .
> When John's parents, James Adams and Betty Jo, turned up, they informed me that
> they didn't want to have the kids back.  James Adams said that John wasn't really his
> son anyway. . . . When John first came to live with us, he ate with his hands like a
> wild animal, as if to say, 'This is mine, don't take it.'  He spent a lot of time on the
> floor in the corner.  The first time I tried to apply medicine to his sores, he screamed.
> But within a couple of months John adjusted.  Once he did adjust, John was a happy
> child living with us.  We kept John and raised him as our own son for almost seven
> years before we were ultimately forced to give him up.  He had his ninth birthday

> shortly after he left us.  For those seven years John was a member of our family, a brother to Andrea, and very close to my husband, who sometimes took John to work sites.  We loved that little boy so much!  I still claim John.

(SHR at 115.)[3]  According to Mrs. Elliott, Petitioner flourished in her home and did well in school. (*Id.* at 116.)  Prior to his ninth birthday, Petitioner's mother successfully contested his adoption, and he was ultimately returned to his biological mother; however, he was not well accepted in his new home with her, her new husband, and her several other children, and he began doing poorly at school.  (*Id.* at 100, 103, 121.)  As described by a sibling, "Whatever he did was wrong in the eyes of Mamma and Charles.  He stayed in trouble." (*Id.* at 99.)

---

[3]  Linda Elliott's account appears somewhat inconsistent with the affidavit of Petitioner's sister, Deborah Chase, who states that she stayed with the Elliotts before John did and that it was *their mother* who had placed these children with friends to "take care of."  (Chase Aff. at 1; SHR at 106.)  However, a Louisiana court order granting the Elliotts temporary custody of Petitioner states the following:

> About four years ago (will be 4 years in November), Mr. Elliott who owns Elliott Plumbing, rented a trailer to a Mr. James Adams, the father of the child John Wade Adams.  At that time Mr. Adams and his wife, Betty, were not living together.  The mother of the child brought four children to Mr. Adams; she kept three.  Mr. Adams came to Mr. Elliott for whom he was working at the time and asked for his paycheck a day early stating that he had to buy groceries for the children which were left with him.  Two days later Mrs. Elliott drove by the trailer, took them (where Mr. Adams had left them alone) home with her and fed them.  Mrs. Elliott went by the trailer where the mother of the children was living with a Charlie Chase (different trailer, different location) and told the mother she had the children.  The mother told Mrs. Elliott she didn't want them and "to do something with them before Charlie got home."  Mrs. Elliott called her sister and brother; the sister took two of the children and the brother took one and Mrs. Elliott kept one, a little girl.
>
> The following morning the mother brought the little boy, John Wade Adams, the subject of this temporary custody order.  She said the Elliotts might as well take him also as she did not want him.  He had sores on him and was very dirty.  He was wearing shoes about four sizes too large.  She brought his meager clothing in a paper bag.  At that time the Elliotts expressed a desire to adopt the child and both the mother and the father accompanied the Elliotts to an attorney and did execute a document granting the Elliotts permission to have the child.
>                                          . . .
> Last Friday, the mother of the children went by the residence of Mrs. Elliott's brother, saw the little girl he had and "skooped" her up.  When the Elliotts went to see the mother of the children concerning this told Mrs. Elliott that she was going to get Johnny also, that she did not want the child but that the other children wanted him home.

(Petr.'s Ex. 2 at Evidentiary Hearing, taken under advisement and admitted by separate order of this Court.)

5

Petitioner's mother and her husbands drank heavily, fought verbally, physically, and emotionally, which spilled over onto the children, who received harsh discipline, such as hitting them with specially-fashioned belts and switches so hard that legs would bleed.  (*Id.* at 97, 99, 103.) Police were called regarding the family violence, which Petitioner described as "living with the Tasmanian Devil and his wife."  (*Id.* at 120.)  Petitioner was also shaken by the shoulders, "slapped upside the head," and hit in the head and face.  (*Id.* at 103.)  Petitioner recalled that "Charles picked me up by the ears and banged my head against the wall."  (*Id.* at 120.)  Petitioner's mother gave him a black eye, and when he was knocked to the floor was seen "kicking him and stomping on him." (*Id.* at 99, 103.)  When Betty Jo took to "running the streets" again, Petitioner was again abandoned, moved around, and subjected to sexual abuse by his legally-presumptive father and alienation from others.  (*Id.* at 100, 107, 109-10, 113, 117, 120-21.)

Petitioner also submitted an affidavit from Dr. Lundberg-Love, a professor of psychology at the University of Texas at Tyler.  (*See id.* at 125-35.)  Dr. Lundberg-Love talked to Petitioner in prison, gave him psychological tests, and reviewed his prison records.  (*Id.* at 126.)  She also read the affidavits from family and friends.  (*Id.*)  Her report summarized Petitioner's psychological state. (*Id.* at 125-35.)  Her investigation revealed that Petitioner "suffered significant physical neglect by his biological mother, and substantial emotional and physical abuse as a child and teenager."  (*Id.* at 125.)  She described Petitioner as a "feral child" when he came into Elliott's home, and noted that it was apparent from her interview with him that he had "no knowledge regarding the neglect and abuse that he experienced as an infant" or "the circumstances surrounding how his custody was transferred to his biological mother."  (*Id.* at 126-27.)  She described a chaotic, abusive living environment other than the period Petitioner lived with the Elliotts.  (*Id.* at 126-28.)  She described

6

an extensive history of alcohol and drug abuse.  (*Id.* at 127-28.)  She noted that one psychological exam (CATI) placed Petitioner "one standard deviation LOWER than the average score" on the "Sadistic scale"; thus, indicating that even though Petitioner "may be angry and have some antisocial attitudes, it is unlikely that he is a viscous, sadistic type of person" but rather his "aggression tends to take the form of passive-aggression" as indicated by a different psychological exam (MCMI-III).  (*Id.* at 130.)  Prison records showed Petitioner's IQ of 86 put him in the "dull normal" range.  (*Id.* at 128.)  Dr. Lundberg-Love concluded that Petitioner has an unspecified bipolar disorder, dependency on drugs and alcohol that are in remission in a controlled environment, an unspecified personality disorder with borderline and antisocial features, and problems related to interaction with the legal system.  (*Id.* at 131.)

### 2.      State's Habeas Evidence

During the postconviction habeas-corpus review in state court, the district attorney's office responded to Petitioner's application with its own evidence, including the affidavits of lead trial counsel David Pickett, co-counsel Hugh Lucas, and defense investigator Michael Christopher.

In his affidavit, Pickett set forth his qualifications and addressed Petitioner's claims.  Specifically, Pickett described his communications with Petitioner and Petitioner's family regarding the need for witnesses, particularly character witnesses that could testify at his trial.  (Pickett Aff. at 2; SHR at 300.)  Pickett stated that he repeatedly asked Petitioner for witnesses, but Petitioner only provided the name of his mother.  (Pickett Aff. at 2; SHR at 300.)  Pickett called and spoke with Petitioner's mother and step-father, and told them that he needed witnesses and when the trial would be, but received no favorable response from them.  (Pickett Aff. at 2-3; SHR at 300-01.)  Regarding the evidence of childhood abuse, neglect, and trauma that Petitioner presented in the state court

proceedings, Pickett stated even though Petitioner had told him about hardships he had endured during his childhood, he did not tell him about all of that evidence and Pickett did not think the things that Petitioner told him would be effective as mitigating evidence.[4]  (Pickett Aff. at 3; SHR at 301.)  Further, even if he had all of that evidence, Pickett might not have presented any of it because it was "two-edged" and the jury might have considered it more aggravating than mitigating. (Pickett Aff. at 3; SHR at 301.)

Regarding the expert mental health evidence that Petitioner presented, Pickett responded that if he had presented such evidence, which juries often disregard anyway, the prosecution would have countered with their own expert testimony.  (Pickett Aff. at 3; SHR at 301.)  He also stated that such evidence is a "two-edged" sword, and described how presenting it was likely to do more harm than good.  (Pickett Aff. at 3-4; SHR at 301-02.)  Pickett also described the bad character evidence that he had received from the prosecution, and how difficult he expected it would be in the punishment stage if he were convicted, but that he thought that they had a good shot at an acquittal because Petitioner was not the one that actually killed the victim.  (Pickett Aff. at 4-5; SHR at 302-03.)

Co-counsel, Hugh Lucas, also provided an affidavit, in which he set forth his qualifications and experience to serve at Petitioner's trial.  (Lucas Aff. at 1; SHR at 306.)  He explained that at the time of his appointment, Pickett had already investigated the case, spoken with some family mem-

---

[4]  The specific nature of Petitioner's statements regarding his childhood "hardships" is not entirely clear from Pickett's affidavit, which states:

> Mr. Adams, in his mid-thirties at the time of trial, told me about hardships he had endured during his childhood.  He did not tell me about any adoption which fell through.  I did not think he believed he had been abused.  Nor did I think the things  he told me constituted the kind of abuse that would be effective as mitigating evidence.  Lots of kids had childhood experiences similar to what Mr. Adams told me occurred in his childhood, but most have not become criminals.

(Pickett Aff. at 3; SHR at 301.)

bers, and had not discovered anything favorable to Petitioner. (Lucas Aff. at 2; SHR at 307.) He also described the prosecution's evidence of Petitioner's bad character, stated that evidence of childhood abuse and psychiatric or psychological evidence is a double-edged sword, and explained how presenting such evidence in the punishment phase could be more harmful than presenting nothing at all. (Lucas Aff. at 2-3; SHR at 307-08.)

Defense investigator, Michael Christopher also provided an affidavit that was presented to the state court in which he described his qualifications and service in Petitioner's case. From his conversations with Petitioner, Christopher explained that Petitioner believed that he would either not be convicted or not be given the death penalty because he had cooperated with the police. (Christopher Aff. at 1; SHR at 391.) Christopher noted his investigation of the facts of the offense along with a reluctance to involve Petitioner's family, explaining that Petitioner did not want to bring his family into this matter, that they had jobs and would not come. (Christopher Aff. at 1; SHR at 391.)

Even so, Petitioner gave Christopher the phone number for Petitioner's mother. (Christopher Aff. at 2; SHR at 392.) Christopher described his conversations with Petitioner's mother and brother, during which Christopher asked them about Petitioner's childhood but did not discover any problems. (Christopher Aff. at 2; SHR at 392.) Christopher also stated that they showed no interest in coming to Dallas on Petitioner's behalf. (Christopher Aff. at 2; SHR at 392.)

### 3.    State Court Findings

Based upon the trial court's findings and its independent review, the Texas Court of Criminal Appeals denied relief in a written order on September 11, 2002. *Ex parte Adams*, 52,032-01, slip

op. at 1 (Tex. Crim. App. Sept. 11, 2002) (unpublished).  The findings concerning the investigation

of mitigation evidence are as follows:

> 33. The Court finds that the State has attached as an exhibit to its original answer an affidavit from defense counsel David Pickett.  The Court finds that Pickett told Applicant that he was charged with capital murder and that they needed witnesses, that Applicant gave Pickett the name of his mother, and that as a result, Pickett talked to Applicant's mother and stepfather early in his representation of Applicant.  Pickett told them what Applicant was charged with and that Applicant needed witnesses, but he got no affirmative response.  He talked to them after the State decided to seek the death penalty.  He told them when the trial would be and said they needed witnesses.  Again, neither offered any favorable response.  Nor did they give him the names of any other possible witnesses.  Defense counsel told Applicant that he needed character witnesses to testify for him at trial, but Applicant did not provide any names or offer any suggestions.  If Pickett had had any leads about witnesses for Applicant, he would have pursued them.  (State's Writ Exhibit C).

> . . .

> 43. The Court finds that, because Pickett talked to Applicant about his childhood, Pickett discussed potentially mitigating evidence with Applicant.

> 44.  The Court finds that although Pickett did not believe that the hardships Applicant experienced in childhood (as related by Applicant) would necessarily be effective in the punishment phase of Applicant's case, Pickett repeatedly asked Applicant for the names of family members he could talk to, and Applicant only gave him the names of his mother and his stepfather. (State's Writ Exhibit C at 3).

> . . .

> 46. The Court finds that Pickett's assertion that Applicant only gave him the name of his mother and stepfather is substantiated by the fact that his investigator Mike Christopher states that the only name Applicant gave Christopher to contact was his mother and that Applicant specifically told him that he did not want his family brought into this matter. (State's Writ Exhibit H).

> 47. The Court finds that Applicant did not provide his counsel or investigator with any helpful leads regarding punishment witnesses. *See Strickland*, 466 U.S. at 692 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant *and on information supplied by the defendant*")(emphasis added).

> 48.  The Court finds that Applicant did not want counsel to contact his family members.

. . .

> 57. The Court finds and concludes that trial counsel attempted to investigate Applicant's background, "but were hindered by external forces." *See Dowthitt v. Johnson*, 230 F.3d 733, 749 (5th Cir. 2000)(holding that trial counsel's failure to present mitigating evidence via family members during punishment phase of capital murder trial was not deficient, where defendant did not want any of his family testifying on his behalf, and counsel attempted to investigate defendant's background but were thwarted by uncooperative potential witnesses).

(SHR at 515-16, 519-20, 522.)

**C.     *Federal Proceedings***

Petitioner filed his federal petition for writ of habeas corpus on September 4, 2003.  On that same date, Petitioner filed his second motion to take the deposition of his trial counsel.[5]  Respondent filed an answer with brief in support on December 31, 2003,[6] and furnished the state court records.  On August 19, 2004, the Court granted Petitioner's second motion for leave to depose his trial attorney David Pickett.

Petitioner took the deposition of David Pickett on October 1, 2004, in Dallas, Texas, and on December 10, 2004, moved to expand the record to include the deposition.  By order dated January 3, 2005, the Court granted the motion to expand the record to include the deposition.  On June 22, 2005, the Court ordered the parties to file supplemental briefs addressing the impact of the deposition, a recent Supreme Court case, and whether an evidentiary hearing was warranted.  Petitioner filed a motion to expand the record, for summary judgment, or in the alternative, for an evidentiary hearing on July 20, 2005.  The Court granted the July 20, 2005 motion to expand the

---

[5]  Prior to filing his petition, on February 14, 2003, Petitioner filed his first motion for permission to take the deposition of his trial counsel, which was denied by order dated March 6, 2003.

[6]  Respondent's answer states that the five claims raised in the petition appears to have been exhausted; he does not request that any of those claims be dismissed or denied on this ground.  (Ans. at 2.)

record, denied the motion for summary judgment based on existing issues of fact, and ordered an evidentiary hearing by orders dated September 6 and 21, 2005.

On October 18, 2005, the Court conducted an evidentiary hearing, at which trial counsel and his retained investigator testified. The parties subsequently filed post-hearing briefs.

## IV.  ISSUES

Petitioner raises the following five claims for relief in his federal writ and contends that he is entitled to an evidentiary hearing:

(1)     Trial counsel was ineffective for failing to investigate substantial, readily available evidence in mitigation of the death penalty;

(2)     Trial counsel was ineffective for failing to object to improper prosecutorial argument and failing to obtain an instruction to limit the jury's consideration of certain extraneous conduct;

(3)     Appellate counsel was ineffective for failing to raise on appeal the trial court's denial of an instruction on the lesser-included offense of murder;

(4)     The trial court improperly excluded a juror for conscientious scruples against the death penalty; and

(5)     The prosecution suppressed evidence from the defense that would have impeached a prosecution witness.

## V. APPLICABLE LAW

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1217, on April 24, 1996. Title I of the Act applies to all federal petitions for habeas corpus filed on or after its effective date. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Because Petitioner filed the instant petition after its effective date, the Act applies to his petition.

Title I of AEDPA substantially changed the way federal courts handle habeas corpus actions. Under 28 U.S.C. § 2254(d), as amended by AEDPA, a state prisoner may not obtain relief

with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

      (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

      (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"In the context of federal habeas proceedings, a resolution (or adjudication) on the merits is a term of art that refers to whether a court's disposition of the case was substantive, as opposed to procedural." *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000).

In this case, the state courts adjudicated Petitioner's claims on the merits. Consequently, the AEDPA standards enumerated in 28 U.S.C. § 2254(d) apply to Petitioner's claims.

Section 2254(d)(1) concerns pure questions of law and mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). A decision is contrary to clearly established federal law, within the meaning of § 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

With respect to the "unreasonable application" standard, *Williams* instructs that a writ must issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *accord Penry v. Johnson*, 532 U.S. 782, 792 (2001). Likewise under *Williams*, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to

13

a new context where it should apply." 529 U.S. at 407. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409; *accord Penry*, 532 U.S. at 793.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000). Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## VI. <u>EXPANSION OF THE RECORD AND EVIDENTIARY HEARING</u>

In January 2005, the Court granted Petitioner's motion to expand the record to include the deposition transcript of Petitioner's trial attorney, David Pickett. In September 2005, the Court granted a second motion to expand the record, and ordered an evidentiary hearing.

### A.    *Deposition Testimony*

During his deposition, Pickett testified that he met with Petitioner fairly quickly after his appointment and told him to stop talking to the news media. (Deposition of Pickett at 6-7, attached to Mot. Expand the Record filed Dec. 10, 2004.) He did not initially seek information on Petitioner's family because he was more concerned with the facts of the offense and developing a strategy to that part of the case, because he assumed that Petitioner would get the death penalty if convicted in Dallas County. (*Id.* at 7-9, 30.) Pickett also testified that he left most of the background investigation to the investigator. (*Id.* at 13-14.)

Pickett did obtain names of family members and the phone number for Petitioner's mother from Petitioner.  (*Id.* at 10-12, 30.)  Although he asked her for Petitioner's background history, he had difficulty getting information from her.  (*Id.*)  It seemed to Pickett that she really did not care.  (*Id.* at 12-13.)  Pickett at one point remembered Petitioner telling him that he did not have "too good of a young life", and that he had many siblings, and that he had had a foster mother for a number of years, but Pickett did not remember what Petitioner told him about that. (*Id.* at 15-16, 25.)  He later testified that he really did not recall any specific conversations with Petitioner and did not recall any details about Petitioner's foster mother.  (*Id.* at 31-33.)  Pickett did not attempt to investigate or confirm any information that he was given with teachers, friends, or siblings because of the lack of concern by Petitioner's mother and Pickett's perceived financial limitations on his investigation.  (*Id.* at 16-18, 22-24.)  Pickett did not request the funds for such an investigation because he did not think the court would grant them.  (*Id.* at 18, 22-24, 33.)  If he thought he could have obtained the funds for a full mitigation investigation of Petitioner's early childhood abuse, he would have pursued such an investigation, but he might not have used the evidence obtained thereby.  (*Id.* at 21-22, 33.)  Use of discovered evidence would have depended on his evaluation of such evidence and its probable effect on the jury, which he really could not know until after he had conducted an adequate investigation into Petitioner's childhood and background.  (*Id.* at 21-22, 28-29.)  However, he did not do such an investigation, and he did not know about the evidence of childhood abuse that was later discovered.  (*Id.* at 22, 27-29, 31, 33.)

Pickett admitted that they could have contacted other members of Petitioner's family, such as his siblings.  (*Id.* at 26.)  Pickett testified that he did not think he had put on any evidence in the punishment phase of Petitioner's trial, and he was concerned about putting on the evidence of

Petitioner's life because it was bad.  (*Id.* at 27.)  He would have been interested in finding witnesses that could have testified to some good character trait that Petitioner displayed instead.  (*Id.* at 32.) In light of what he now understands the American Bar Association's standards require, he would probably have proceeded more vigorously in the mitigation investigation.  (*Id.* at 34.)

**B.**      ***Evidentiary Hearing***

"When there is a factual dispute, [that,] if resolved in the petitioner's favor, would entitle [him] to relief and the state has not afforded the petitioner a full and fair evidentiary hearing, a federal habeas corpus petitioner is entitled to discovery and an evidentiary hearing."  *See Hughes v. Johnson*, 191 F.3d 607, 630 (5th Cir. 1999) (quoting *Goodwin v. Johnson*, 132 F.3d 162, 178 (5th Cir. 1997)).  While the AEDPA added limits to the availability of an evidentiary hearing when the habeas petitioner has failed to develop the factual basis of the claim in the state court proceedings, 28 U.S.C. § 2254(e)(2), such is not the case when the habeas petitioner was prevented from fully developing the factual basis of a claim through no fault of his own.  "Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."  *Williams v. Taylor*, 529 U.S. 420, 432 (2000).  "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437.

Petitioner met this threshold burden, having made numerous requests before the state district court and the Texas Court of Criminal Appeals for an evidentiary hearing or to depose witnesses in connection with his claim that trial counsel was ineffective for failing to investigate mitigating evidence at his trial.  (SHR 89, 174-82, 192-95, 369-88; Mots. filed in Tex. Ct. of Crim. Appeals on

Dec. 15, 2000, Mar. 21, 2001, and Mar. 23, 2002.)  Although the state district court on habeas re-view recognized that controverted, previously unresolved issues existed regarding Petitioner's claim that his trial counsel failed to adequately investigate mitigation evidence concerning his childhood, it did not allow him an evidentiary hearing or any method to compel his trial counsel to testify, such as by deposition, in order to resolve that issue.  Instead, it only accepted affidavits that the parties could voluntarily obtain from the witnesses that chose to cooperate.  (SHR at 367.)  Even so, the state court findings predicated the denial of Petitioner's claims largely on his failure to prove the allegations of his petition.  (*See generally* SHR at 504-98.)  Petitioner's attempts to develop the factual basis of his claim in state court were denied either by express order or by inaction.  (SHR 196, 597-98.)  Accordingly, this Court finds that Petitioner did not fail to develop in the state courts the factual basis of the claim that his trial counsel failed to investigate mitigating evidence of Petitioner's childhood in contravention of 28 U.S.C. § 2254(e)(2).

However, merely because an evidentiary hearing is not prohibited by 28 U.S.C. § 2254(e)(2) does not mean that an evidentiary hearing is required.  *See McDonald v. Johnson*, 139 F.3d 1056, 1059-60 (5th Cir. 1998).  This Court has discretion to grant an evidentiary hearing in accordance with the Rules Governing Section 2254 Cases in the United States District Courts.   Rule 8(a) of those rules provides that "[i]f the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted."  The Court may choose alternate means to develop the facts short of an evidentiary hearing, and may refuse to conduct an evidentiary hearing if the evidence before it is sufficient to make an informed decision on the merits.  *See McDonald*, 139 F.3d at 1060.

In the instant case, the Court requested further briefing from the parties on the impact of recent case law and the need for an evidentiary hearing. From these briefs, and from its own review of the record, the Court found that the evidence contained in the records presented to the state court, along with the deposition of trial counsel, indicated that an evidentiary hearing was warranted concerning Petitioner's claim that trial counsel was ineffective for failing to investigate mitigating evidence.

The Court conducted the evidentiary hearing on October 18, 2005. Petitioner appeared in person and by appointed counsel, and Respondent appeared through the Office of the Assistant Attorney General. (Tr. of Evid. Hr'g at 3 [hereinafter Hearing].) Petitioner called his trial attorney David Pickett and defense investigator Michael Christopher to testify at the hearing, and presented affidavits and other documentary evidence. Respondent examined the called witnesses and presented his own documentary evidence at the hearing. The relevant portion of the testimony is set forth below.

### 1.   __Testimony of David Pickett__

Pickett testified that he met with Petitioner soon after appointment, and then quickly obtained the assistance of an investigator, Michael Christopher. (*Id.* at 14, 64.) Pickett normally would not independently investigate a defendant's background, but would wait until the investigator informed him that there was something useful. (*Id.* at 67.) In this case, he would have expected Christopher to get medical and school records, particularly if they would show "something good" about Petitioner, such as becoming an Eagle Scout, doing extra work for people in the community, going to church, or anything showing positive character. (*Id.* at 19-20.) Pickett testified that he believed that Christopher would have known what kind of information that Pickett wanted him to get, but

18

Pickett could not remember specific instructions to Christopher regarding the investigation. (*Id.* at 19-20, 35-36.) Pickett did not remember asking Christopher to get the names and contact information for any of Petitioner's family members, teachers, physicians, or psychiatrists. (*Id.* at 35-36.) He could not remember whether Christopher discovered any names or contact information on family members, but remembered that Christopher did not obtain much information on the family. (*Id.* at 38-39.) Pickett considered Petitioner's character evidence to be "all bad." (*Id.* at 77, 104.)

Pickett had a good relationship with Petitioner, who actively participated in his defense and was cooperative and forthcoming. (*Id.* at 68, 72-74, 111.) However, he also complained that Petitioner did not give him much information about his family; Pickett asked Petitioner repeatedly for "witnesses," but he did not explain to Petitioner what kind of witnesses he meant. (*Id.* at 29-31.) Pickett did not remember if Petitioner had any objections to his contacting his family members. (*Id.* at 41.) Pickett did not ask Petitioner specifically for the names of teachers, siblings, other relatives, foster parents, or hospitals where he had been admitted, and he could not remember if he asked for contact information on Petitioner's family, although it was his routine to do so. (*Id.* at 30-31, 40-42, 111-13.) Pickett could not remember what he and Petitioner discussed, specifically as it related to the punishment phase of the trial. (*Id.* at 14, 39-40.) However, he did testify that Petitioner told him a lot of "negative things" about his background. (*Id.* at 75.)

During his mitigation investigation, Pickett believes that he probably spoke with Petitioner's mother and step-father on the telephone on at least a couple of occasions. (*Id.* at 27-28.) He testified that he had asked Petitioner for his mother's phone number, so he felt comfortable that he had actually spoken with Petitioner's mother. (*Id.* at 28-29.) He could not remember her name or any details of his conversations with her, but he testified that he would have informed her of the

19

situation and asked her for any help she could provide.  (*Id.* at 33-34.)  Pickett did not believe that

he would have asked her for the names of any teachers, physicians or psychiatrists for Petitioner,

but he would have expected Christopher to do that.  (*Id.* at 34-35.)  Pickett could not remember if

he asked Petitioner's mother for names and contact information on Petitioner's other family

members.  (*Id.* at 35, 41.)  Petitioner's mother was unusually uncooperative for a woman who's son

was facing the death penalty.  (*Id.* at 36-37, 39, 43-44, 93.)  This impression was consistent with

what Christopher told him about his conversations with her.  (*Id.* at 36-37.)

Pickett testified that he believed they had a good chance of defending at the guilt/innocence

stage even though the prosecution's case was strong.  (*Id.* at 16.)  The defense thoroughly investi-

gated the circumstances surrounding the crime, and Pickett even sat through the co-defendant's trial;

however, the investigation "bogged down" in the area of punishment.  (*Id.* at 66-67, 110.)  Pickett

did not believe the defense could mount a persuasive defense on the future dangerousness special

issue.  (*Id.* at 18.)  He felt that if Petitioner was convicted of this offense, he would not stand much

of a chance of avoiding the death penalty because that result was normally a foregone conclusion

in Dallas County.  (*Id.* at 24-26.)  However, the circumstances of the offense, Petitioner's reduced

role, his reporting of the crime and cooperation with the police, were useful in terms of mitigation

or reduction of punishment.  (*Id.* at 17, 70-71.)  Pickett agreed with the attorney general's statements

that Pickett had made a "strategy decision" not to present evidence regarding Petitioner's back-

ground in the punishment stage.  (*Id.* at 81, 83.)  Pickett also claimed to have made a strategy

decision to not use a mental health expert even though he did not actually know what the results of

a mental health evaluation would have been.  (*Id.* at 51-59, 106-09.)

When asked about the mitigation evidence that habeas counsel had obtained, Pickett explained that he would have expected those witnesses to "come forward" to provide that information to him, and that the reason that he had not obtained it was because those witnesses did not come forward. (*Id.* at 22, 27.)  However, even if they had come forward with that information, he was still not sure that he would have used it because of the mindset of Dallas juries and the ways that the prosecution has of getting around that kind of evidence, even though he did not have a categorical bias against ever presenting background mitigation evidence.  (*Id.* at 21, 23-26, 47-48, 81, 84-91; State's Ex. 2 A, B, and C.)  Pickett conceded that he would have needed to know about the evidence in order to make a determination on whether they could mount a persuasive defense on the mitigation special issue, and he did not.  (Hearing at 18-21, 27, 47-48, 103-04.)  Pickett also testified that he would have sent an investigator to Louisiana if he had been given a large enough budget for that, but he did not ask for it, and he did not think to preserve the issue for appeal.  (*Id.* at 45, 49, 51.)

     2.     **Testimony of Michael Christopher**

Christopher also testified concerning his work as an investigator for Petitioner's defense. He did not consider himself to be a mitigation specialist, was not comfortable with that term, was not aware of any published guidelines for conducting mitigation investigations, and did not know if it involved a special license or certification.  (*Id.* at 160-63, 206.)  However, he thought he had worked on hundreds of cases, including eleven or twelve death penalty cases, before his work on Petitioner's case, and thought he would have done that sort of thing anyway.  (*Id.* at 163, 196, 207.) Approximately eighty percent of his work on those death penalty cases was in the investigation of

the facts of the offense rather than in the mitigation investigation of a defendant's background.  (*Id.* at 163-64.)

Christopher initially testified that he relied upon the instructions from the attorney regarding the investigation, especially in death penalty cases which typically involved specific instructions. (*Id.* at 165-66.)  In Petitioner's case, Pickett had particular objectives in mind, and gave Christopher instructions mostly to find witnesses in the guilt/innocence stage of the trial.  (*Id.* at 166-67.) Christopher did not remember specific instructions regarding the mitigation investigation except that Pickett wanted him to do one.  (*Id.* at 167-68.)  However, he later testified that Pickett did not give him specific instructions regarding a mitigation investigation because Christopher would have known what to do.  (*Id.* at 184.)  Pickett did tell Christopher to try to find out things about Petitioner's early life by contacting Petitioner's mother and any family that he could reach.  (*Id.* at 169.)

Christopher agreed with Petitioner's habeas attorney that in every capital murder case, the investigation should develop evidence in most of the following areas:  a defendant's birth trauma, developmental delays, educational history, special educational needs, military history (including length of service and training), family and social history (including physical, sexual, or emotional abuse), prior juvenile record and correctional experience (including conduct and supervision in the institutions), and religious and cultural influences throughout the defendant's life.  (*Id.* at 208-09.) However, Christopher testified that he did not do any of that in Petitioner's case because of the absence of instructions from Pickett.  (*Id.*)  Pickett did not ask him to gather any kind of records in connection with mitigation, such as school or hospital records.  (*Id.* at 168-69.)  It did not occur to him independently to look into school records during the investigation.  (*Id.* at 203.)  Christopher

stated that it was not his job to decide what was essential, but to report it to Pickett and let him decide. (*Id.* at 224.)

Christopher met with Petitioner at the Dallas County Jail to discuss the case, but he could not remember any details of his interview, and he had lost his file. (*Id.* at 170-72.) He recalled being frustrated that Petitioner was not taking the whole thing seriously enough because he thought that he would not get the death penalty based on his cooperation with the authorities, and that Petitioner gave the prosecution all of their information while giving his defense team none. (*Id.* at 181-82, 213.) Christopher could not remember any attempt to impress upon Petitioner the importance of cooperating with his defense team. (*Id.* at 182.) Christopher initially testified that he remembered discussing with Petitioner the importance of a mitigation investigation and what it could mean in a criminal prosecution, but then contradicted himself and testified that he could not remember discussing with Petitioner the importance of producing mitigating evidence in order to avoid the death penalty. (*Id.* at 181-82.) He further testified that he did not explain to Petitioner what mitigating evidence was or give him any idea what evidence might have been mitigating. (*Id.* at 183.) Petitioner did not give him any information about his childhood, schooling, mental health history, how he was raised, or any difficulties with abuse or neglect. (*Id.* at 194.) However, Christopher did not remember asking him questions about that either, because they were focused in their investigation on the circumstances of the offense, and Petitioner did not want his family bothered. (*Id.* at 194-95.)

Christopher testified that Petitioner did not want to involve anyone in his family because they had jobs and needed to work. (*Id.* at 176-77, 179.) Petitioner did provide the contact information for his mother, but not for anyone else. (*Id.* at 180-81.) However, Christopher did not insist on such information. (*Id.* at 181) Petitioner's mother was not interested or cooperative, and did not volun-

teer any information.  (*Id.* at 189-90.)  He explained to her that this was a death penalty case, a very

serious case, and that Petitioner could be executed.  (*Id.* at 202.)  He asked Petitioner's mother about

any mitigating evidence, such as whether Petitioner was mentally retarded, or had been abused or

neglected as a child, but she did not reveal any.  (*Id.* at 185-86.)  However, Christopher admitted that

he would not have expected her to disclose any.  (*Id.* at 186.)

Even though Christopher knew Petitioner had brothers and sisters while he was speaking

with Petitioner's mother, he did not ask her for any of their contact information.  (*Id.* at 187-90.)

Instead, he asked her to have them call him, and he believes that one of them (Mike) did, although

he could not remember whether he contacted Mike or Mike contacted him.  (*Id.* at 187-89, 201.)

Christopher waited for the others to contact him, and they did not.  (*Id.* at 189-90.)  Although

Christopher testified at one point that Mike refused to give him contact information on Petitioner's

other brothers and sisters, he later admitted that he did not remember if he had actually asked him.

(*Id.* at 218-22.)  Christopher asked Mike if Petitioner had any problems growing up, such as abuse,

neglect, learning disabilities, and health issues, and Mike did not mention any.  (*Id.* at 200.)  Mike

also told him that he could not come because he had a new job, and that he did not want his mother

to come because she was sick.  (*Id.* at 177-78, 188-89.)

Christopher testified that the lack of interest by Petitioner's mother and brother raised a "red

flag" that he reported to Pickett, but not to Petitioner.  (*Id.* at 202, 219.)  He considered it "an

astounding lack of information" to help in the punishment phase of the trial.  (*Id.* at 223-24.)

Christopher further testified that he could have found Petitioner's other brothers and sisters if he had

been instructed to do that, that it would have cost only about $250 to find them if they wanted to

cooperate but no more than $500 even if he did not have their names.  (*Id.* at 191-93.)  However,

24

Christopher received no further instructions from Pickett on this matter, and at the time did not see anything that he thought needed further investigation. (*Id.* at 193-95, 204.)

Having considered the state court record as supplemented in this federal proceeding by the deposition and evidentiary hearing, the Court proceeds to the examine the merits of Petitioner's claims consistent with the standards enunciated in AEDPA.

## VII.  INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL - MITIGATING EVIDENCE

In his first claim for relief, Petitioner contends that his right to the effective assistance of counsel was violated by the failure of his trial counsel to investigate "substantial, readily available evidence in mitigation of the death penalty." (Pet. at 3; Brief in Supp. at 15.)

The Sixth Amendment guarantees a defendant the right to the effective assistance of counsel. U.S. CONST. Amend. VI.  To successfully state a claim of ineffective assistance of counsel under Supreme Court precedent, Petitioner must demonstrate (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  A failure to establish either prong of this test requires a finding that counsel's performance was constitutionally effective. *Id.* at 696.  The Court may address the prongs in any order. *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000).

To prove deficiency, a Petitioner "must show that counsel's performance fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88.  This requires a showing that the errors made by his counsel were so serious that such counsel was not functioning as the counsel guaranteed by the Sixth Amendment. *Id*. at 687.  To determine whether counsel's performance is constitutionally deficient, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Id.* at 689.  Further, "[t]he reasonableness of counsel's

25

actions may be determined or substantially influenced by the defendant's own statements or actions." *Id.* at 691.  Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight.  *Id.* at 689.

To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  In the context of ineffective assistance of trial counsel, the prejudice component of the *Strickland* test "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000) (citations and internal quotation marks omitted).  "When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer – including an appellate court, to the extent it independently reweighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.  Stated differently, Petitioner must show that omitted mitigating evidence "might well have influenced the jury's appraisal of his moral culpability." *See Williams*, 529 U.S. at 398; *Wiggins v. Smith*, 539 U.S. 510, 538 (2003); and *Rompilla v. Beard*, 125 S. Ct. 2456, 2459 (2005).  Reviewing courts must consider the totality of the evidence before the finder of fact in assessing whether the result would likely have been different absent the alleged errors of counsel.  *Id.* at 695-96.

Petitioners must "affirmatively prove prejudice." *Id.* at 693.  They cannot satisfy the second prong of *Strickland* with mere speculation and conjecture. *Bradford v. Whitley*, 953 F.2d 1008, 1012

(5th Cir. 1992).  Conclusory allegations, furthermore, are insufficient to obtain habeas relief.  *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990).

A failure to investigate the basis of a mitigation defense can amount to ineffective assistance of counsel.  *See, e.g., Williams v. Taylor*, 529 U.S. 362, 390 (2000).  A "failure to develop . . . mitigating background evidence is not[, however,] *per se* deficient performance." *Moore v. Johnson*, 194 F.3d 586, 615 (5th Cir. 1999); *accord West v. Johnson*, 92 F.3d 1385, 1408 (5th Cir. 1996) (noting that it had many times held that failure to present a case in mitigation during the sentencing phase of a capital murder trial is not, per se, ineffective assistance of counsel).  The merits of such a claim "are squarely governed" by *Strickland*.  *Williams*, 529 U.S. at 390.  *Strickland* provides:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.
>
> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.  In particular, what investigation decisions are reasonable depends critically on such information.  For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.  And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.  In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

466 U.S. at 690-91.

The Supreme Court in *Strickland* found no deficiency of counsel when counsel made a "strategy choice [that] was well within the range of professionally reasonable judgments, and the decision not to seek more character or psychological evidence than was already in hand was likewise reasonable." *Id.* at 699.  In so finding, the Supreme Court noted that (1) it was well known to counsel that the trial judge viewed it important to own up to one's crimes; (2) overwhelming aggravating circumstances were present; (3) "counsel could reasonably surmise from his conversations with [the defendant] that character and psychological evidence would be of little help"; (4) the defendant had already mentioned "at the plea colloquy the substance of what there was to know about his financial and emotional troubles"; and (5) limiting testimony regarding the defendant's "character to what had come in at the plea colloquy ensured that contrary character and psychological evidence and [his] criminal history, which counsel had successfully moved to exclude, would not come in." *Id.*  In view of "the overwhelming aggravating factors", the Supreme Court found "no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed." *Id.* at 700.

Since *Strickland*, the Supreme Court has on several occasions revisited the issue of ineffective assistance of counsel in failing to investigate a mitigation defense.  *See Williams*, 529 U.S. 362; *Wiggins v. Smith*, 539 U.S. 510 (2003); and *Rompilla v. Beard*, 125 S. Ct. 2456 (2005).  In *Williams*, the Supreme Court found:

> [Counsel] failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records.  Had they done so, the jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his

parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.

Counsel failed to introduce available evidence that Williams was "borderline mentally retarded" and did not advance beyond sixth grade in school. They failed to seek prison records recording Williams' commendations for helping to crack a prison drug ring and for returning a guard's missing wallet, or the testimony of prison officials who described Williams as among the inmates "least likely to act in a violent, dangerous or provocative way." Counsel failed even to return the phone call of a certified public accountant who had offered to testify that he had visited Williams frequently when Williams was incarcerated as part of a prison ministry program, that Williams "seemed to thrive in a more regimented and structured environment," and that Williams was proud of the carpentry degree he earned while in prison.

*Id.* at 395-96 (footnote and citations omitted).

Although the Supreme Court also noted that "not all of the additional evidence was favorable to Williams", it found that "the failure to introduce the comparatively voluminous amount of evidence that did speak in Williams' favor was not justified by a tactical decision to focus on Williams' voluntary confession", and the omissions "clearly demonstrate that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." *Id.* at 396. The Supreme Court further found that the omissions prejudiced Williams within the meaning of *Strickland*, and that the state court's decision was "contrary to" and an "unreasonable application" of Supreme Court precedent. *Id.* at 396-98. It noted that, although the state court

correctly emphasized the strength of the prosecution evidence supporting the future dangerousness aggravating circumstance . . . the state court failed even to mention the sole argument in mitigation that trial counsel did advance – Williams turned himself in, alerting police to a crime they otherwise would never have discovered, expressing remorse for his actions, and cooperating with the police after that. While this, coupled with the prison records and guard testimony, may not have overcome a finding of future dangerousness, the graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was "borderline mentally retarded," might well have influenced the jury's appraisal of his moral culpability.

*Id.* at 398.

Subsequently, in *Wiggins*, the Supreme Court reiterated the cited *Strickland* standards, and noted that "*Williams v. Taylor* is illustrative of the proper application of these standards." 539 U.S. at 521-22.  In *Wiggins,* the defense attorneys attempted to justify a limited mitigation investigation "as reflecting a tactical judgment not to present mitigating evidence at sentencing and to pursue an alternative strategy instead." *Id.* at 521.  The Court found that the relevant issue was "whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was *itself reasonable*." *Id.* at 523.  Looking at the investigation leading up to the decision not to introduce mitigating evidence, which included (1) obtaining psychological testing that "revealed nothing . . . of petitioner's life history"; (2) examining a written Presentence Investigation Report (PSI) that included a one-page personal history which noted his "misery as a youth" and described his background as "disgusting"; and (3) locating social services records (DSS records) that documented various placements in foster care, the Supreme Court concluded that this limited investigation "fell short" of then prevailing professional standards.[7] *Id.*  at 523-24.  It further concluded that "[t]he scope of their investigation was also unreasonable in light of what counsel actually discovered in the DSS records", *i.e.*, a chronic alcoholic mother; multiple moves from foster home to foster home during which Wiggins displayed emotional difficulties; lengthy absences from school; and "at least one occasion" when "his mother left him and his siblings alone for days without food." *Id.* at 525.  Stated differently, it found that the "decision to end their investigation when they did was neither consistent with the professional standards that prevailed in 1989, nor reasonable in light of the evidence counsel uncovered in the social services records – evidence that would have

---

[7]The Court cited the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("Guidelines") which "provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Id.* (quoting Guidelines 11.4.1(c)), p. 93 (1989) (emphasis added by Supreme Court).

led a reasonably competent attorney to investigate further." *Id.* at 534. It thus found satisfaction of the requirements for habeas relief set forth in 28 U.S.C. § 2254(d) because the state court had "unreasonably applied *Strickland*" and "partially relied on an erroneous factual assumption" that the "social service records . . . recorded incidences of . . . sexual abuse." *Id.* at 528, 534.

Most recently, in *Rompilla v. Beard*, 125 S. Ct. 2456 (2005), the Supreme Court again found that ineffective assistance of counsel warranted habeas relief in the context of an alleged failure to adequately investigate mitigation evidence. In *Rompilla*, the prosecution presented evidence at punishment to prove three aggravating factors to justify a sentence of death – (1) Rompilla committed the murder in the course of another felony; (2) the murder was accomplished by torturing the victim; and (3) Rompilla had a significant criminal history that indicated the use or threat of violence. *Id.* Defense counsel presented "relatively brief" mitigation testimony from family members who argued for "residual doubt" and sought mercy from the jury. *Id.* Rompilla's son testified at punishment that "he loved his father and would visit him in prison." *Id.* at 2460-61. Based upon the evidence presented, the jury found two factors in mitigation – that the "son had testified on his behalf and that rehabilitation was possible". *Id.* at 2461. The jury nevertheless found the aggravating factors more weighty and sentenced Rompilla to death. *Id.*

During post-conviction habeas proceedings, Rompilla asserted that his trial attorney rendered ineffective assistance by "failing to present significant mitigating evidence about [his] childhood, mental capacity and health, and alcoholism." *Id.* The claim met with varying degrees of success on post-conviction review: it failed on state habeas review, succeeded at the federal district court level, and failed again when the federal court of appeals reversed the grant of habeas relief. *Id.*

31

Applying the well-established *Strickland* standard, the Supreme Court found that counsel rendered deficient representation, that Rompilla was prejudiced thereby, and that the state court's resolution of the ineffective assistance claim was objectively unreasonable.  *Id.* at 2462-69.  The court found that defense counsel rendered obviously deficient performance by "failing to examine the court file on Rompilla's prior conviction" despite knowledge that the prosecutors "intended to seek the death penalty by proving Rompilla had a significant history of felony convictions indicating the use or threat of violence, an aggravator under state law," including a prior conviction for rape and assault that the prosecutor would use to emphasize his violent character.  *Id.* at 2463-64.  With respect to the prejudice prong of *Strickland*, it found that "Rompilla has shown beyond any doubt that counsel's lapse was prejudicial" because had defense counsel examined the file related to Rompilla's prior conviction, "it is uncontested they would have found a range of mitigation leads that no other source had opened up" and such leads would have led to mitigating evidence that certainly would have affected the mitigation case presented to the jury and created a reasonable likelihood of a different result at punishment.  *Id.* at 2467-69.  In short, the Supreme Court held "that even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial."  *Id.* at 2460.  The Supreme Court distinguished the circumstances in *Rompilla* from those in *Strickland* by noting:

> Questioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there.  But looking at a file the prosecution says it will use is a sure bet:  whatever may be in that file is going to tell defense counsel something about what the prosecution can produce.

*Id.* at 2467 (citation omitted).

Turning to the facts of this case, it is undisputed that Petitioner's trial counsel and the retained investigator conducted a limited mitigation investigation. Petitioner was cooperative with counsel; he told counsel "a lot of negative things" about his background, childhood, his many siblings, and he provided his mother's contact information. Although the testimony of both trial counsel and the investigator reveals some confusion for primary responsibility in directing the mitigation investigation, both ultimately spoke with Petitioner's mother, and both recalled that she appeared disinterested and unwilling to help. The investigator ultimately spoke with Petitioner's younger brother, Mike, who also did not provide useful information. Based on the available information about Petitioner's childhood, the relative certainty of a death sentence upon conviction, counsel's experience with Dallas juries and the effect of abuse/neglect evidence, the abundance of "bad" character evidence, and Petitioner's lesser role in the murder and cooperation with the police, counsel apparently made a "strategy decision" to focus on the guilt/innocence stage and to not present evidence regarding Petitioner's background in the punishment stage or use a mental health expert.

In *Smith v. Dretke*, 422 F.3d 269 (5th Cir. 2005), the Fifth Circuit reiterated *Wiggins'* emphasis "that deference is owed strategic decisions *when the investigation supporting those judgments was adequate.*" *Id.* at 279. However, even when counsel has made some effort to investigate mitigation, the relevant issue is whether the conducted investigation was adequate in light of professional norms. *Id.* at 280 (citing *Wiggins*, 539 U.S. at 523 (the relevant issue is whether the investigation supporting counsel's decision not to introduce mitigating evidence is itself reasonable). In this case, the Court cannot help but conclude that the investigation upon which trial

counsel's "strategy decision" was based was inadequate.  Significantly, trial counsel reluctantly admitted, both in his deposition and during the evidentiary hearing, that the investigation was not sufficient for him to make an informed decision about whether to present a mitigation case.  This concession is supported by the record, which demonstrates that substantial mitigating evidence was readily available.

First, the testimony clearly reflects that neither trial counsel nor the investigator can recall ever explaining what mitigation evidence was to Petitioner, the importance of a mitigation investigation, and what it could mean in a criminal prosecution.  Although counsel repeatedly requested names of people who could provide "good" character evidence, neither remembered asking Petitioner for the names of witnesses who might have information about his childhood, schooling, mental health history, how he was raised, or abuse or neglect, in part because they were focused in their investigation on the circumstances of the offense.  Despite claims that Petitioner did not provide the names of witnesses and did not want his family bothered, Petitioner did provide the contact information for his mother as well as information about his many siblings.  Trial counsel testified in his deposition that he remembered Petitioner telling him about a foster mother, although he later testified that he did not recall any details about Petitioner's foster mother.  Thus, counsel appears to have been aware of her existence, but he failed to contact her or direct the investigator to contact her.

Second, when the investigator and trial counsel contacted Petitioner's mother, she proved to be unusually unhelpful for a woman whose son was facing the death penalty, and this raised a "red flag".  The investigator testified that he discussed this "red flag" with counsel, but he never spoke to Petitioner about it.  Thus, despite the "red flag" of his mother's disinterest, coupled with

34

Petitioner's prior information regarding the abuse he could remember, neither counsel nor the investigator appear to have questioned Petitioner about his relationship with his mother or the childhood he could remember.  According to his affidavit, Petitioner's earliest childhood memories were of around age five, when he was living with his foster family, and this should have been another "red flag."

Counsel also knew about the many siblings, including the older siblings who could have provided him the information regarding Petitioner's early childhood and placement with a foster mother; indeed, one of them lived in the foster home with Petitioner.  However, there was minimal effort to find the siblings:  a request to a disinterested mother to have the siblings contact the attorney or the investigator.  There is no evidence in the record that their contact information was requested from the mother, or that there was any further effort to find them after all but one (a younger sibling who would not have known of Petitioner's early childhood) failed to contact the investigator.  This disinterest by a virtually all of Petitioner's family was in essence yet another "red flag."  Yet, despite the relatively low cost ($250-$500) to find these family members, no such effort was made.

Finally, mitigating evidence could have been discovered through an independent psychological or psychiatric evaluation of Petitioner.  Trial counsel decided against attempting any sort of independent mental health evaluation apparently out of a fear that the state could have brought in an expert to say that Petitioner was "just flat mean."  The decision to not present mental health evidence was thus made without any attempt to obtain expert mental health information to even determine whether such evidence would be helpful.

Based on the foregoing, the Court finds that trial counsel's decision to end the investigation was neither consistent with then prevailing professional standards (of which he was unaware), nor reasonable in light of the "red flag" of Petitioner's disinterested mother and the known evidence of his placement in a foster home – evidence that would have led a reasonably competent attorney to investigate further. *See Wiggins,* 539 U.S. at 534. As the Supreme Court found in *Wiggins,* the scope of the investigation was also unreasonable in light of the evidence known to the foster mother: a two-year-old Petitioner covered with sores alone with his siblings for days without food by an alcoholic mother, who essentially gave him away, only to remove him several years later from a stable, loving home and place him into a chaotic and sometimes violent household where he was never accepted. Indeed, the available evidence which counsel failed to uncover in this case is strikingly similar to that in *Wiggins* and *Williams*. *See* 539 U.S. at 525; 529 U.S. at 395-96. Counsel therefore rendered deficient representation.

The Court further finds that such deficient performance was prejudicial because had trial counsel followed up with the foster mother, he would have found a range of mitigation leads that Petitioner's family would not provide, and such leads would have led to mitigating evidence that certainly would have affected the mitigation case presented to the jury and created a reasonable likelihood of a different result at punishment. *See Rompilla*, 125 S.Ct. at 2467-69. Reweighing the evidence in mitigation, including the aggravating effect of the circumstances of the crime along with the mitigating effect of Petitioner's reduced role and subsequent reporting of the crime and cooperation with the police, this Court finds that the mitigating evidence which was available and not presented to the jury "might well have influenced" the jury's appraisal of Petitioner's moral culpability. *See id.* at 2459; *Wiggins*, 539 U.S. at 538; *Williams*, 529 U.S. at 398 (noting that while the

sole argument in mitigation that trial counsel did advance–Williams turned himself in, alerting police to a crime they otherwise would never have discovered, expressing remorse for his actions, and cooperating with the police after that, coupled with the prison records and guard testimony–may not have overcome a finding of future dangerousness, the graphic description of Williams' childhood, filled with abuse and privation, or his mental health evaluation, showed the necessary prejudice).  The record before this Court, viewed as a whole and cumulative of mitigation evidence presented originally, raises a reasonable probability that the result of the sentencing proceeding would have been different if competent counsel had presented and explained the significance of all the available evidence.  *See Williams,* 529 U.S. at 398.  This is sufficient to undermine confidence in the outcome actually reached at sentencing.  *See Rompilla,* 125 S.Ct. at 2459; *Strickland,* 466 U.S. at 694.  Therefore, the prejudice prong of the *Strickland* test has been met, and Petitioner's first claim for relief should have been granted by the state courts.

The state court's denial of this claim on its merits was contrary to, and involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  *See* 28 U.S.C. §2254(d)(1); *Williams,* 529 U.S. at 398; *Rompilla,* 125 S.Ct. at 2459; *Strickland,* 466 U.S. at 694.  The decision was also based on unreasonable determinations of fact in light of the evidence of the inadequate mitigation investigation presented in the State court proceeding.  *See* 28 U.S.C. §2254(d)(2).  Accordingly, Petitioner's first claim for relief should be granted with respect to his sentence of death.

## VIII.  INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL - OBJECTIONS

In his second claim for relief, Petitioner complains of trial counsel's failure to object to the prosecutor's argument and to the court's instructions in the punishment phase of the trial.  In response to Petitioner's trial counsel argument that certain witnesses were "'outlaws' and 'deal-makers' who, because of charges pending against themselves, fashioned their testimonies to fit what they believed the police wanted them to say", (Brief in Supp. at 58; 35 RR 21-28, 33), the prosecutor argued:

> [I]f there's a one of you, even one of you on this jury who believes that I have somehow cut some sort of implied, express or otherwise, deal with any of these witnesses, if any of you believe that I have attempted to defraud you, the Court, and this criminal-justice system somehow in this case, when you go back there to that jury room, I want you to do something for me.

> Before you decide whether this man is guilty or not guilty of this crime, if a one of you believes that's occurred, you say not guilty.  Simply do it if you believe it.  *But I'm going to stand here and tell you again, that has not occurred in this case.  It hasn't occurred through the DeSoto Police Department.  It hasn't occurred through us.*

(Brief in Supp. at 59 (emphasis added by Petitioner); 38 RR at 49.)  Petitioner claims that this argument violates state law in that it constitutes unsworn testimony, and he quotes other (apparently less objectionable) parts of the prosecutor's argument as having "compounded" this error.  (Brief in Supp. at 59-60.)

A failure to object does not constitute deficient representation unless a sound basis exists for objection.  *See Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997) (noting that a futile or "meritless objection cannot be grounds for a finding of deficient performance").  Even with such a basis, however, an attorney may render effective assistance despite a failure to object when the failure is a matter of trial strategy.  *See Burnett v. Collins*, 982 F.2d 922, 930 (5th Cir. 1993) (noting that a

38

failure to object may be "a matter of trial strategy as to which [the courts] will not second guess counsel").  "A decision not to object to a closing argument is a matter of trial strategy." *Drew v. Collins*, 964 F.2d 411, 423 (5th Cir. 1992); *accord Wiley v. Puckett*, 969 F.2d 86, 102 (5th Cir. 1992) (Defense attorney "could reasonably have decided not to risk antagonizing the jury by objecting, or he could have decided that his best strategy was to let his own closing argument (recited before the State's) speak for itself".)  On habeas review, the federal courts do not second guess an attorney's decision through the distorting lens of hindsight, but rather the courts presume that "counsel's conduct falls within the wide range of reasonable professional assistance  . . . [and], under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland v. Washington*, 466 U.S. 668, 689 (1984) (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

In this instance, Petitioner has not overcome the presumption that the failure to object falls within the wide range of reasonable assistance.  Whether these arguments were improper as a matter of state law has been determined adversely to Petitioner.  (SHF Nos. 107-112, 128-29; SHR at 538-39, 544-45).  In a habeas proceeding, this Court does not sit in review of a state court's interpretation of its own law.  *See Engle v. Isaac*, 456 U.S. 107, 119-21 (1982); *Johnson v. Cain*, 215 F.3d 489, 494 (5th Cir. 2000) (referring to "the long-standing principle that federal courts do not sit to review questions of state law"); *Creel v. Johnson*, 162 F.3d 385, 395 (5th Cir. 1998); *Weeks v. Scott*, 55 F.3d 1059, 1063 (5th Cir. 1995).  Because the state court found that the prosecutorial argument did not give rise to objection as a matter of state law, and Petitioner has not identified any federal law that was violated by this argument, it should not be used as a basis for finding that counsel's representation was deficient.  Furthermore, to the extent the argument provided a valid basis for objection, the failure to object is a matter of trial strategy that this Court does not second guess.  The state

court's finding that this was a reasonable trial strategy has not been shown to be incorrect. For all of these reasons, the Court finds that the failure to object does not constitute deficient representation.

Additionally, Petitioner has shown no reasonable probability that, but for the failure to object, the result of trial would have been different. The failure to object does not undermine confidence in the verdict. Consequently, petitioner has not carried his burden to affirmatively show that he was prejudiced by the failure to object to the prosecutorial argument.[8]

Because Petitioner has shown no deficiency of counsel and no prejudice from the failure to object to the prosecutor's argument, the failure does not constitute ineffective assistance of counsel, and thus, entitles petitioner to no habeas relief.

## IX.  INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL - FAILURE TO REQUEST LIMITING INSTRUCTION

Petitioner also complains in his second claim for relief that his trial counsel failed to request a limiting instruction regarding extraneous bad acts, including prior convictions, pursuant to Rule 105(a) of the Texas Rules of Criminal Evidence. However, this matter of state law was also determined adversely to Petitioner. (SHF Nos. 134-60; SHR at 546-56). In addition, having made the strategic decision to introduce such evidence himself, Petitioner may not have been in a position to obtain such a limiting instruction. *See, e.g., Gonzales v. State*, 672 S.W.2d 618, 620 (Tex. App.– Amarillo 1984, no pet.); (SHF No.148; SHR 551). Nevertheless, the trial court gave a limiting instruction to the jury – the instruction, however, differed from the one Petitioner now contends that his attorney should have requested. (SHF No. 149; SHR 551). Further, the state habeas court found this to be a matter of trial strategy, which has not been shown to be incorrect. (SHF Nos.146-47,

---

[8] The Court notes that the findings of the state trial court that such argument was proper were made by the same judge that conducted the trial, and thus any asserted object would have been overruled.

154-55; SHR 550-52).  Therefore, this conduct was not deficient and it is unnecessary to consider prejudice.  Petitioner is entitled to no habeas relief for the alleged failure to request a limiting instruction.

## X.  INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

In his third claim, Petitioner contends that his right to the effective assistance of counsel on appeal was denied when his appellate counsel failed to raise the trial court's denial of his request for an instruction on the lesser-included offense of murder.  (Pet. at 4; Brief in Supp. at 75).

Criminal defendants have a constitutional right to effective assistance of counsel in their first appeal.  *Evitts v. Lucey*, 469 U.S. 387, 393-95 (1985); *Douglas v. California*, 372 U.S. 353, 356-57 (1963).  "A claim of ineffective assistance based on the failure to argue an issue on appeal is governed by the familiar two-part *Strickland* test."  *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000).

To satisfy the deficiency prong of *Strickland*, Petitioner must show that the performance of his appellate counsel was deficient in an "objectively unreasonable" manner.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  Further, "[t]he Constitution does not require appellate counsel to raise every nonfrivolous ground that might be pressed on appeal."  *Ellis v. Lynaugh*, 873 F.2d 830, 840 (5th Cir. 1989); *accord Jones v. Barnes*, 463 U.S. 745, 754 (1983) ("For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the very goal of vigorous and effective advocacy that underlies *Anders [v. California,* 386 U.S. 738 (1967)].  Nothing in the Constitution or our interpretation of that document requires such a standard.").  Instead, appellate counsel should winnow out "weaker

arguments on appeal and focus[] on one central issue if possible, or at most on a few key issues." *Barnes*, 463 U.S. at 746.

To show prejudice, when an attorney has "failed to adequately brief an issue on direct appeal, [Petitioner] must show initially that the appeal would have had, with reasonable probability, a different outcome if the attorney adequately addressed the issue." *United States v. Dovalina*, 262 F.3d 472, 474-75 (5th Cir. 2001). Petitioner "must then demonstrate that the attorney's deficient performance led to a fundamentally unfair and unreliable result." *Id.*

Petitioner's third claim does not satisfy either prong of *Strickland*. Texas courts apply a two-part test to determine entitlement to an instruction on a lesser included offense. *See Rousseau v. State*, 855 S.W.2d 666, 672-73 (Tex. Crim. App. 1993) (en banc). "[F]irst, the lesser included offense must be included within the proof necessary to establish the offense charged, and, second, some evidence must exist in the record *that would permit a jury rationally to find* that if the defendant is guilty, he is guilty only of the lesser offense." *Id.* at 673.

> Where a defendant requests a charge on the lesser-included offense of murder, based upon a dispute about the element that aggravates the murder to capital murder, the second prong of *Rousseau* is satisfied only "[i]f there is some evidence which negates the aggravating element or if the evidence of such aggravating element is so weak that a rational jury might interpret it in such a way as to give it no probative value."

*Wolfe v State*, 917 S.W.2d 270, 278 (Tex. Crim. App. 1996) (quoting *Robertson v. State*, 871 S.W.2d 701, 706-07 (Tex. Crim. App. 1993)).

In this instance, the state courts have determined that Petitioner was not entitled to an instruction on murder. This matter of state law has been determined adversely to Petitioner, and as previously mentioned, this Court does not sit in review of a state court's interpretation of its own law. The issue in this case was not the fact of Petitioner's involvement in the theft of the victim's

property, but the degree of involvement in the murder which preceded the theft. Petitioner testified that he was involved in the theft, but denied that he was involved in the murder, (34 RR at 158-164, 166), and he was granted an instruction on the lesser-included offense of theft, (CR at 63-64). The state court held that Petitioner was not entitled to an instruction on the lesser-included-offense of murder, and that if such a complaint had been made in his direct appeal that would have lacked merit and not have prevailed. (SHF Nos. 195-219; SHR at 564-68). Petitioner has not shown this finding to be incorrect, and a review of the evidence presented at trial supports the finding. No trial evidence supports the necessary conclusion that if Petitioner was guilty of anything, he was guilty only of murder.[9] Had counsel raised the issue on appeal, it would not have succeeded. Therefore appellate counsel's conduct was neither deficient nor prejudicial. Consequently, Petitioner's third claim entitles Petitioner to no habeas relief.

## XI.  TRIAL COURT ERROR

In his fourth claim for relief, Petitioner contends that the trial court erred in striking a juror for cause on the basis of her conscientious scruples against the death penalty.

With respect to the constitutional standard for striking a juror for cause based upon his or her views regarding the death penalty, *Wainwright v. Witt*, 469 U.S. 412 (1985) provides the relevant Supreme Court precedent. *See McFadden v. Johnson*, 166 F.3d 757, 758-60 (5th Cir. 1999). As set out in *Witt*,

> [T]he quest is for jurors who will conscientiously find the facts and apply the law and find the facts. That is what an "impartial" jury consists of . . .. [T]he proper standard for determining when a prospective juror may be excluded for cause because of his

---

[9] The evidence established Petitioner's involvement in the theft, and the issue turned on his level of involvement in the murder. The evidence that connected him to the murder did not suggest any reason for such involvement other than the theft. For example, Petitioner stated after the offense while he was negotiating to exchange some of the victim's property for drugs that "Man, I just killed for this [stuff]." (32 RR at 107 (expletive deleted).)

or her views on capital punishment . . . is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."

469 U.S. at 423-24.

In this case, the state trial court, appellate court, and postconviction habeas courts all found against Petitioner on this issue. (SHF Nos. 175-92; SHR at 559-63). The habeas court found specifically that although the juror thought the death penalty was proper and appropriate in some cases, she personally could not vote for it. (SHF No. 184; SHR at 561). The following exchange occurred during the defense attorney's voir dire examination of this potential juror:

> Q. So you are saying, Miss Nira, no matter how bad the defendant is, no matter how vicious and horrible the killing was, some are very horrible, terrible, –
>
> A. Right.
>
> Q. Sadistic killings, you're saying that you could never vote the death penalty for anyone?
>
> A. Right.

(9 RR at 138). This testimony reflects that the potential juror's views would "prevent or substantially impair" her ability to render a true verdict in the punishment phase of the trial.

Petitioner argues that because the special issues do not ask jurors to "vote for the death penalty" or themselves decide whether a capital defendant should be put to death, then the service of this juror would not be substantially impaired by her refusal to do so. (Brief in Supp. at 94, 87). This position not only relies on the wrong legal standard, it also conflicts with the critically important role of jurors in capital cases to exercise the ultimate responsibility for the death penalty in connection with their consideration of mitigation evidence. *See, e.g., Caldwell v. Mississippi*, 472

U.S. 320, 333 (1985).  The Court finds that the excluded juror was properly excused for cause under existing Supreme Court precedent.  As such, Petitioner is entitled to no habeas relief on this claim.

## XII.  PROSECUTORIAL MISCONDUCT

In his fifth claim for relief, Petitioner claims that the prosecution engaged in misconduct by withholding exculpatory evidence from him in violation of the Fourteenth Amendment.  Specifically, Petitioner complains of the failure to disclose information concerning an inducement made to witness Llewelyn Mosely in exchange for his testimony against co-defendant Gregory Wright.

The "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  "*Brady* claims involve 'the discovery, after trial of information which had been known to the prosecution but unknown to the defense.'" *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994).  "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *accord Banks v. Dretke,* 540 U.S. 668, 691 (2004).

"[E]vidence is 'material' under *Brady*, and the failure to disclose it justifies setting aside a conviction, only where there exists a 'reasonable probability' that had the evidence been disclosed the result at trial would have been different." *Wood v. Bartholomew*, 516 U.S. 1, 5 (1995).  Suppressed evidence is not considered material within the meaning of *Brady* when similar evidence is admitted before the trier of fact.  *E.g., Jackson v. Johnson*, 194 F.3d 641, 650 (5th Cir. 1999); *Westley v. Johnson*, 83 F.3d 714, 725 (5th Cir. 1996).  In addition, "[t]he mere possibility that an

45

item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-10 (1976).

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)). In other words, there must be "a 'significant possibility' of a different result to characterize the *Brady* materiality standard." *Strickler*, 527 U.S. at 300 (Souter, J., concurring). In any event, the touchstone inquiry remains "whether the evidentiary suppression 'undermines our confidence' that the factfinder would have reached the same result." *Id.* at 300-01.

In the instant case, Mosely testified that he received property from Petitioner and his co-actor which had been stolen from the deceased victim, and that Petitioner asked him the punishment range for capital murder. During the trial, Petitioner's trial attorney cross examined Mosley on a number of issues, including the danger of charges from this incident and the possibility that his statement to the police was influenced by such danger. The cross-examination included the following:

> Q. Now based on everything that was going on out there, you're receiving stolen property, and you did put it in your house, didn't you?
>
> A. Yes.
>
> Q. Your felony usage of crack cocaine that day, and you were using it that day, weren't you?
>
> A. Yes.
>
> Q. Did they place you in the Dallas County Jail?

A.  No, they didn't.

Q.  Sir?

A.  No.

Q.  Isn't it a fact that once again, Mr. Mosley, being the deal maker that you are, you cut yourself a deal?  Isn't that true?

A.  No.  I didn't go to Dallas County Jail. They took me to the DeSoto.

Q.  Well, I understand that you never made it to the Dallas County Jail.  How long were you at the DeSoto city jail?

A.  48 hours.

Q.  And then they cut you loose, didn't they?

A.  Yes.

Q.  But while they had you in custody, you gave a written statement, did you not, sir?

A.  I gave several of them.

Q.  You gave more than one?

A.  Yes.  They more or less kept, you know, going over and overseeing if I could, you know, – more or less telling the truth.  If I would stray from what I was saying.

Q.  Let me stop you there.  In other words, you'd expound a little bit after they'd talk to you for a while?

A.  Expand.

Q.  Your story.

A.  No.

Q.  Well, you said you gave several stories.

A.  Well, I would give it over, you know, the same story over and over again.  They would take it down more than once.

Q.  So, they did take it down more than once?

47

> A.  Yes.

(32 RR at 169-70.)  Petitioner's trial counsel then discussed one of the statements that Mosley gave to the police.

> Q.  As you say you kept giving more of your statement and adding to it; answering questions; is that correct?
>
> A.  Yes.

(*Id.* at 171-72.)  Petitioner's trial counsel also brought out the fact that Mosley's wife was arrested with him at the time and is still in jail, that he has been indicted for a drug offense with a range of punishment from twenty-five years to life in prison, and that his attorney was present in the courtroom and his trial was pending.  (*Id.* at 176, 178.)  Trial counsel also got Mosley to admit that a great deal of his fate was in the hands of "these senior prosecutors," how plea bargains worked, and that he was ready to face whatever plea bargain was given to him.  (*Id.* at 179, 181-82.)

Although the defense vigorously cross examined Mosely regarding his unrelated criminal charges and the possibility that he could be charged with an offense arising out of his testimony, there was apparently no agreement or deal for such testimony.  In his attempt to discover and prove such an agreement, Petitioner's trial counsel was allowed to examine Mosley's attorney in chambers, prevented only from disclosing confidential attorney/client communications.  Petitioner does not allege that there was any agreement between the state and this witness, but merely that certain comments by the prosecutor during the Co-actor's trial, during negotiations with Mosley's attorney, "operated as an inducement to Mosely to testify to whatever he believed the police and prosecutor's wanted to hear."  This comment was reflected in an affidavit from the prosecutor, as follows:

> Traylor [Mosley's attorney] expressed his concern that Mosley might be charged with a crime because of his testimony.  In response, I surmised that the police saw Mosley solely as a witness in the instant capital murder and that if they had wanted

> to charge him with the offenses associated with Wright's and [Petitioner's] actions
> after the murder, they probably would have already done so.

(Jordan Aff. at 2; SHR at 315).  This comment was made long after Mosley had been interviewed by the police and had already given them his affidavit setting forth the substance of his testimony. Petitioner contends that this comment operated as an "inducement" because it made Mosley want to say whatever he thought the prosecution wanted him to say, or face charges.  This theory is not persuasive for at least three reasons: (1) the actual words of the prosecutor indicated that the charging decision was already made by the police and not him, (2) Mosley had already given the statement to the police long before the comment was made, and (3) the cross examination at trial more effectively brought out any impeachment value to Mosley's predicament facing possible charges than this comment would have.

For the foregoing reasons, the Court finds the alleged undisclosed statement not material within the meaning of *Brady*.  The nondisclosure, furthermore, did not prejudice Petitioner.  This claim entitles Petitioner to no habeas relief.

### XIII.  CONCLUSION

For each of the reasons set out above, each of the claims for relief should be overruled other than Petitioner's first claim for relief that he was deprived of the effective assistance of counsel in the investigation and presentation of mitigating evidence in the punishment stage of his trial. Accordingly, the petition for writ of habeas corpus should be granted only on the first claim, and Petitioner should be granted relief in the event that the state of Texas does not afford him a new punishment hearing within reasonable time.  *See Moore v. Johnson*, 194 F.3d 586, 615 (5th Cir. 1999).  All other relief requested should be denied.

## XIV.  RECOMMENDATION

Petitioner has shown that he was denied the effective assistance of counsel in the invest-igation and presentation of mitigating evidence at the punishment phase of his trial.  Accordingly, he is entitled to habeas corpus relief if the state of Texas does not afford him a new trial on the issue of punishment within a reasonable time from the entry of the District Court's final order in this case. In all other respects, Petitioner has failed to make a substantial showing of the denial of a federal right.  The state court adjudication on the merits neither resulted in a decision that was contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding on any claim other than Petitioner's first claim for relief as stated above.  Accordingly, the first claim in Petitioner's petition for a writ of habeas corpus should be **GRANTED**, and all of his other claims should be **DENIED**.

**SO RECOMMENDED** on this 12th day of September, 2006.


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT.

The United States District Clerk shall serve a true copy of these findings, conclusions and recommendation on the parties.  Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must serve and file written objections within ten days after being served with a copy.  A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made.  The District Court need not consider frivolous, conclusory or general objections.  Failure to file written objections to the proposed findings, conclusions and recommendation within ten days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE